UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JEFFREY BROWN,<br><br>　Plaintiff,<br><br>　v.<br><br>MERCHANTS AUTOMOTIVE GROUP, INC.,<br><br>　Defendant. | Civil Action No. |

**COMPLAINT**
**JURY TRIAL REQUESTED**
<u>**INJUNCTIVE RELIEF REQUESTED**</u>

NOW COMES the Plaintiff, Jeffrey Brown, by and through undersigned counsel, and complains against the Defendant, Merchants Automotive Group, Inc. ("Defendant" or "Merchants"), as follows:

<u>INTRODUCTION</u>

1. This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*; the New Hampshire Law Against Discrimination ("354-A"), RSA 354-A *et seq.*; the New Hampshire Whistleblower Protection Act ("NHWPA"); and New Hampshire's common law protections against wrongful terminations in violation of public policy.

<u>PARTIES</u>

2. Mr. Brown is a United States citizen residing in Arizona.

1

3. Merchants is a New Hampshire corporation based in Hooksett, New Hampshire, with motor vehicle dealerships in multiple locations in New Hampshire.

## JURY TRIAL DEMAND

4. Plaintiff requests a trial by jury on all issues triable to a jury.

## JURISDICTION

5. Merchants had 400 or more employees for each working day in each of 20 or more calendar weeks in 2017, 2018, and 2019.

6. The amount in controversy in this matter exceeds $75,000.

7. This Court has subject matter jurisdiction over Mr. Brown's federal and state claims under 28 U.S.C. §§ 1331, 1332, and 1367.

8. On or about May 16, 2019, Mr. Brown filed a timely Charge of Discrimination against Merchants with the New Hampshire Commission for Human Rights ("NHCHR") which was dual filed with the U.S. Equal Employment Opportunity Commission ("EEOC").

9. On or about February 21, 2020, the EEOC issued a Notice of Right to Sue with respect to Mr. Brown's federal law claims.

10. On or about February 18, 2020, the NHCHR concluded its investigation.

11. Mr. Brown has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

## FACTUAL ALLEGATIONS

12. Mr. Brown began working for Merchants on or about July 31, 2017, as a Salesperson.

13. When Mr. Brown's employment with Merchants began, Marcus Luce was the General Sales Manager and Mr. Brown worked under the direct supervision of Sales Manager Charles Wolfe.

14. In 2018, Mr. Brown was limping around at work because he had radiculopathy in his back which causes pain in his legs.

15. Mr. Brown's radiculopathy was an impairment that substantially limited him in major life activities including, but not limited to, the major bodily functions of neurological and musculoskeletal function.

16. Co-workers and managers, including Mr. Luce and Mr. Wolfe, asked Mr. Brown why he was limping. Mr. Brown told them that he had nerve problems in his back which caused pain in his legs.

17. During the summer of 2018, Mr. Brown was studying up on rules regarding vehicle finance because he was hoping to move into a job in finance.

    a. Through his studies, he discovered that Merchants had engaged in some practices which violated state and federal law.

    b. One of those unlawful practices involved deferred down payments on vehicle purchases.

    c. Merchants would sometimes accept promissory notes from customers and count the amount of the promissory note toward the down payment. Consequently, the customer would pay part of the down payment at the time of the sale and would agree, through the promissory note, to pay the rest of the down payment at a later date.

d. Merchants violated the law because when it accepted these promissory notes for down payments, it did not include the amount of the promissory note in the Truth in Lending Statement.

e. Another illegal practice occurred when customers would be coached to inflate their incomes when they filled out credit applications. These fraudulent income numbers would be given to banks for purposes of getting financing.

f. Another illegal practice occurred when the advertised price of a vehicle on the dealership's website would be increased while a customer was negotiating to purchase the vehicle.

g. The advertised price would be increased to help get the customer to pay more for the vehicle. This was often done to help defray fees that banks charged Merchants to finance a vehicle purchase.

h. A Sales Manager, Scott Reinert, was often involved with coaching customers to inflate their incomes on credit applications and with the changing of the advertised price of vehicles while customers were negotiating to purchase them.

18. On or about August 23, 2018, Mr. Brown spoke to Mr. Luce at his desk and they discussed the following.

a. Mr. Brown told Mr. Luce that Merchants was breaking the law when it accepted promissory notes for a down payment and did not include the amount of the promissory note in the Truth in Lending Statement.

b. Mr. Brown told Mr. Luce that Merchants broke the law when it coached customers to inflate their incomes on their credit applications.

c. Mr. Brown told Mr. Luce that Merchants broke the law when it changed the advertised price of a vehicle while a customer was negotiating to purchase the vehicle.

d. Mr. Brown told Mr. Luce that Merchants should stop doing these things because they were illegal.

e. In response to what Mr. Brown said about these unlawful practices, Mr. Luce told Mr. Brown that he was speaking with a "potty mouth," which was a saying Mr. Luce used when he did not like what someone said.

f. To change the topic of the conversation, Mr. Luce asked Mr. Brown about his back and if he was on any medication.

g. Mr. Brown told Mr. Luce that he took prescribed medication for his back. Mr. Brown said that he took codeine at night before he went to bed, for pain, and that he also took a steroid.

h. Mr. Luce ended their conversation by asking Mr. Brown to go sit at his (Mr. Brown's) desk.

19. The following also happened on or about August 23, 2018, the same day that Mr. Brown spoke to Mr. Luce about the unlawful practices and his medications.

a. About ten minutes after Mr. Brown finished speaking with Mr. Luce about the unlawful practices and his medications, some people from human resources (HR) came to Mr. Brown and asked him to go speak with them.

b. The HR people asked Mr. Brown what medications he was taking and he told them, like he had told Mr. Luce, that he took prescribed medication for his back.

He told them that he took codeine at night, before bed, and a steroid during the day.

c. Shortly after this meeting with HR, Mr. Brown was required to go to a medical testing place that Merchants used for its employees, ExpressMED.

d. Before he was directed to go to ExpressMED, no one (i) asked Mr. Brown if he wanted to go to the doctor, (ii) said to him that they thought he was impaired, or (iii) said to him that they thought he needed immediate medical attention.

e. One of the HR employees told Mr. Brown that he was being sent to ExpressMED so that they could make sure he could lift 50 lbs.

f. Before he was directed to go to ExpressMED, Mr. Brown felt fine and did not need to see a doctor.

g. When Mr. Brown learned that he was being required to go to ExpressMED, he became extremely stressed because he thought management was looking for a reason to terminate him.

h. Mr. Brown was told to go with a company driver who took him to ExpressMED. As they were driving to ExpressMED, Mr. Brown began to have chest pain.

i. At ExpressMED, Mr. Brown was told that his blood pressure was extremely high and that he should be in the emergency room. They said that he needed to see his doctor before he could be cleared to return to work.

j. After he finished up at ExpressMED, the company driver took Mr. Brown back to Merchants. From there, Mr. Brown wanted to drive himself to his own doctor but Mr. Reinert instructed Mr. Brown to use the company's driver to take him to the doctor.

k. When he got to his doctor's office, Mr. Brown's blood pressure had lowered but it was still elevated. His doctor had him undergo some medical testing and prepared a note which said Mr. Brown could return to work the following afternoon.

20. On August 23, 2018, Ms. Noel sent the following email:

From: Tracy Noel
Sent: Thursday, August 23, 2018 5:15 PM
To: Miro Radujkovic <miroradujkovic@rightdirectionfinancial.com>; Marcus A. Luce <marcusluce@merchantsauto.com>; Charles Wolfe <charleswolfe@merchantsauto.com>
Cc: Alicia Hart <aliciahart@merchantsfleet.com>
Subject: Jeffrey Brown

Hi team,

Thank you for noticing something was off with Jeff today. We were able to get him to the Dr.'s office and evaluated today. His blood pressure was extremely high and who knows what could have happened had we all not taken the action we did today. Great job everyone!

I received a note today from his primary care Dr. stating that he can return to work tomorrow after 12pm without restrictions. Please let us know should you see any further signs.

Have a good night everyone!

Tracy Noel, PHR, SHRM-CP | Director of Human Resources | Merchants Fleet Management

21. Mr. Brown did not share the medical information in Ms. Noel's August 23, 2018, email with any of the people to whom she sent the email and he did not authorize Ms. Noel to share that information with any of the people to whom she sent the email. The people she sent the email to did not need to know all of the medical information in the email.

22. Mr. Brown returned to work after August 23, 2018, but soon after he returned to work Mr. Luce told Mr. Brown (a) that he (Mr. Brown) would need to take a few days of medical leave and (b) that Mr. Brown could no longer work at Merchants if he was going to be taking the medication that he was using for his back problem.

23. Mr. Brown had some paid time off available to him and he took some days off in accordance with Mr. Luce's direction.

24. Mr. Luce at first did not want to approve the pay for Mr. Brown's days off but Mr. Brown went over Mr. Luce's head and got the pay approved.

25. Mr. Brown earned commissions from vehicles he sold. After the episode in which Mr. Brown was sent to ExpressMED and he took some time off from work, management began to make it more difficult for him to sell vehicles and earn commissions. They did this by taking him out of the salesperson rotation.

26. At Merchants, salespeople rotate so that everyone gets a turn to stand outside and get customers as they come to the dealership. There are usually two salespeople outside at a time and the other salespeople wait inside, in a queue, for their turn to go outside.

27. During the period of time after the episode in which Mr. Brown was sent to ExpressMED, when he was at the head of the queue to go outside, managers sometimes made him go do tasks like get mileage off of a vehicle. When he returned from doing these tasks, the managers would make Mr. Brown go to the end of the salesperson queue. This happened a few times per week.

28. Mr. Brown complained about being pushed back to the end of the queue when he was required to go do other tasks but Mr. Luce would not budge and required Mr. Brown to go to the back of the queue.

29. Even when Mr. Wolfe stuck up for Mr. Brown and said that Mr. Brown should not have to go to the back of the queue, Mr. Luce or Mr. Reinert would overrule him.

30. In November, 2018, Mr. Brown complained about additional illegal conduct in connection with the sale of a vehicle to a customer named Ms. Wilson.

    a. Mr. Brown sold Ms. Wilson a Jeep but the Jeep needed a lot of work from the Service Department before he could finalize the sale. The steering mechanism in the Jeep was not functioning properly and it was not safe to drive.

    b. Ms. Wilson also purchased a warranty when Mr. Brown sold her the Jeep. Gordon Lewis was the Merchants employee who sold Ms. Wilson the warranty.

    c. After the Service Department had finished working on the Jeep, but before Ms. Wilson came in to get it, Mr. Luce told Mr. Brown that Mr. Brown had to get Ms. Wilson to take possession of the Jeep or else Mr. Brown would be in trouble.

    d. Mr. Luce told Mr. Brown that, to convince Ms. Wilson to take possession of the Jeep, he had arranged for Dave Ayotte from the Service Department to ride with Ms. Wilson when she test drove the Jeep and to tell her that the Jeep was fixed. Mr. Luce told Mr. Brown that he (Mr. Brown) was supposed to ride with them and just agree with Mr. Ayotte.

    e. Ms. Wilson's appointment to come in and drive the Jeep was a day or so after Mr. Luce told Mr. Brown that he had to get her to take possession of the Jeep.

On the day of her appointment, before she arrived, Mr. Brown took the Jeep for a drive and realized that the steering was still not functioning right.

f. When Mr. Brown realized that the steering on the Jeep still was not working, Mr. Brown went and spoke to Mr. Ayotte about it. Mr. Ayotte said that he thought the steering mechanism was just making a bad noise because of the cold weather that morning. Mr. Brown told Mr. Ayotte that his explanation did not make sense because the steering mechanism had made the same noise in warm weather. Mr. Brown told Mr. Ayotte that he (Mr. Brown) was not going to lie to Ms. Wilson and tell her that the vehicle was fixed.

g. After Mr. Brown spoke to Mr. Ayotte, Mr. Brown went to speak with another manager, Scott Chavanelle. Mr. Chavanelle also drove the Jeep and he agreed with Mr. Brown that the steering was not working right.

h. Mr. Brown decided not to ride along with Ms. Wilson and Mr. Ayotte when Ms. Wilson test drove the Jeep because he could not, in good conscience, say that the Jeep was all fixed.

i. Later that day, Ms. Wilson and Mr. Ayotte took the Jeep for a test drive. Afterwards, Ms. Wilson told Mr. Brown that Mr. Ayotte said the Jeep was fine but she disagreed and she decided not to take possession of it.

j. Ms. Wilson had a child who would have ridden in this Jeep if Ms. Wilson had purchased it. The child was young and still used a car seat. Mr. Brown did not feel right about trying to pressure Ms. Wilson to take possession of the Jeep when he knew that it was not safe for her and her child.

k. At that point, Mr. Brown told Mr. Luce that he was not going to be able to get Ms. Wilson to take possession of the Jeep. Mr. Luce became angry when Mr. Brown told him this and he said to Mr. Brown "there are going to be problems for you."

l. Mr. Brown sold Ms. Wilson a Mitsubishi instead of the Jeep. They finalized that sale on or about November 26, 2018, and she took possession of the Mitsubishi.

m. About a few days after Ms. Wilson purchased the Mitsubishi, Mr. Brown was talking with Finance Manager Steve Coimbra in his office. While he was in Mr. Coimbra's office, an employee named Carrie Ann Bryant, who worked in the dealership's office, came in to speak with Mr. Coimbra. Ms. Bryant had a deal jacket with her related to the sale of the Mitsubishi to Ms. Wilson.

n. When Mr. Brown saw the deal jacket, he said something like "hey, that has my name on it" and Ms. Bryant said, in an irritated tone, "yes, I know." So, Mr. Brown asked her if there was a problem.

o. Ms. Bryant explained that there was a problem because Merchants could not sell the warranty to Ms. Wilson for her Mitsubishi because Merchants had already used the warranty to pay for work on the Jeep.

p. It was illegal for Merchants to use the warranty that Ms. Wilson purchased to pay for repairs to the Jeep because Ms. Wilson never took possession of the Jeep.

q. Mr. Brown told Mr. Coimbra and Ms. Bryant that using the warranty to pay for the repairs to the Jeep was unlawful insurance fraud.

r. When Mr. Brown said this was insurance fraud, Ms. Bryant's facial expression changed from one of irritation to one of concern.

s. After Mr. Brown finished speaking to Mr. Coimbra and Ms. Bryant about this insurance fraud, Mr. Brown left Mr. Coimbra's office and went back to his desk.

t. Shortly after Mr. Brown returned to his desk, he saw that Mr. Luce's supervisor, General Manager Miro Radujkovic, had a meeting with Ms. Bryant and Service Director Drew Young. Mr. Brown could see who was in the meeting because he could see through glass walls into the room.

u. This meeting between Mr. Radujkovic, Ms. Bryant, and Mr. Young lasted for a while and then Mr. Young left and Mr. Luce entered the meeting. Shortly after Mr. Luce joined the meeting, CEO Brendan Keegan joined the meeting as well. When Mr. Keegan joined the meeting, Ms. Bryant left the meeting.

v. Almost immediately after the meeting with Mr. Radujkovic, Mr. Luce, and Mr. Keegan, all of the salespeople were gathered and it was announced that Mr. Luce was going to be demoted to a lesser paying job at another Merchants location. Mr. Keegan said Mr. Luce had taken this demotion so he could spend more time with his family.

31. On December 6, 2018, Mr. Reinert and Mr. Luce called Mr. Brown into a meeting and informed him that Merchants decided to terminate his employment.

a. When Mr. Brown entered the room for the meeting, he saw a folder related to the sale of the vehicle to Ms. Wilson sitting on the table right in the spot where he was asked to sit.

b. Mr. Luce and Mr. Reinert were both there and they said to Mr. Brown "you know why we're here and what we want to discuss."

c. Mr. Luce and Mr. Reinert, who had taken Mr. Luce's place as General Sales Manager, told Mr. Brown that his employment had been terminated.

d. When they terminated Mr. Brown, they said that they were "parting as friends." Mr. Brown did not feel like they were parting as friends.

e. After they said they were "parting as friends," Mr. Reinert and Mr. Luce asked Mr. Brown "what would it take" for Mr. Brown not to cause them any problems and just go away.

f. In response, Mr. Brown just handed them his keys that he used for work and said goodbye.

g. After Mr. Brown left the termination meeting, he called his son to come pick him up because he did not have a car that day that he could use to drive home. While Mr. Brown was waiting for his son, Mr. Reinert offered to drive Mr. Brown home but Mr. Brown declined his offer.

32. After his termination, Mr. Brown obtained a copy of his personnel file from Merchants and it contained a document written and signed by Mr. Reinert which said Merchants terminated Mr. Brown because of "unprofessional behavior, negative actions + attitude toward team mates" and "failure to follow proper etiquet + rules."

33. No one from Merchants explained what Mr. Brown allegedly did that constituted "unprofessional behavior," "negative actions + attitude toward team mates," or a

"failure to follow proper etiquet + rules." Mr. Brown did not believe he acted in a way that justified termination of his employment.

34. On December 13, 2018, Mr. Brown's supervisor, Mr. Wolfe, completed an annual performance evaluation which said that Mr. Brown met expectations. In the area of "collaboration," which is defined as the ability to work "with others to achieve a common goal," Mr. Wolfe gave Mr. Brown a meets expectations rating.

35. Following his termination from Merchants and a period of unemployment, Mr. Brown got a new job.

36. Mr. Reinert is a friend of managers at the company where Mr. Brown got a job after his termination from Merchants.

37. After Mr. Brown began working for this new company, Mr. Reinert and Mr. Radujkovic visited Mr. Brown's workplace on at least one occasion.

38. After Mr. Reinert spoke to Mr. Brown's managers, they began to ask Mr. Brown uncomfortable questions about what happened when Mr. Brown worked for Merchants.

39. At the time of his termination from Merchants, Mr. Brown was 56 years old.

40. In response to Mr. Brown's charge of discrimination, Merchants produced data for all salespeople that Merchants had employed from 2016 through May 29, 2019. This data revealed the following.

   a. Merchants terminated eight salespeople during this period and every one of them was 40 years of age or older at the time of their termination.

   b. The mean age of these terminated salespeople at the time of their terminations was 50.5 years old.

    c. The mean age of salespeople who were not terminated during this period was 46.8 years old. (This mean combines (a) salespeople who voluntarily resigned and (b) salespeople who did not resign and were not terminated. For those salespeople who voluntarily resigned during this period, the mean was calculated based on their age at the time their employment ended. For those salespeople who were not terminated and who did not resign, the mean was calculated based on their age as of May 29, 2019, which was a date Merchants selected when it reported the data to the NHCHR.)

    d. The mean age of the terminated salespeople was statistically significantly higher than the mean age of salespeople who were not terminated.

41. As a result of Merchants' violations of Mr. Brown's rights, he has suffered damages including, but not limited to, lost wages, lost employee benefits, and loss of enjoyment of life.

## COUNT I: ADA – Disability Discrimination

42. Paragraphs 1-41 are incorporated by reference.

43. Defendant's conduct violated the ADA's prohibition against disability discrimination.

44. Defendant discriminated against Mr. Brown because of his disability, because it regarded him as disabled, and/or because he had a record of a disability.

45. Defendant's discriminatory acts included forcing Mr. Brown to undergo a medical evaluation, its interference with Mr. Brown's ability to sell vehicles to customers, and the termination of Mr. Brown's employment.

46. Defendant also violated the ADA's prohibitions on medical inquiries and medical examinations as well as the ADA's confidentiality requirements.

47. Defendant's asserted reasons for forcing Mr. Brown to undergo a medical examination, its interference with Mr. Brown's ability to sell vehicles, and his termination were pretexts for discrimination.

### COUNT II: 354-A – Disability Discrimination

48. Paragraphs 1-47 are incorporated by reference.

49. Defendant's conduct violated RSA 354-A's prohibition against disability discrimination.

50. Defendant discriminated against Mr. Brown because of his disability, because it regarded him as disabled, and/or because he had a record of a disability.

51. Defendant's discriminatory acts included forcing Mr. Brown to undergo a medical evaluation, its interference with Mr. Brown's ability to sell vehicles to customers, and the termination of Mr. Brown's employment.

52. Defendant's asserted reasons for forcing Mr. Brown to undergo a medical examination, its interference with Mr. Brown's ability to sell vehicles, and his termination were pretexts for discrimination.

### COUNT III: ADEA – Age Discrimination

53. Paragraphs 1-52 are incorporated by reference.

54. Defendant also forced Mr. Brown to undergo a medical examination, interfered with Mr. Brown's ability to sell vehicles, and terminated Mr. Brown because of his age in violation of the ADEA.

55. Defendant's asserted reasons for its decision to force him to undergo a medical examination, its interference with his ability to sell vehicles, and its termination of his employment were pretexts for discrimination.

## COUNT IV: 354-A – Age Discrimination

56. Paragraphs 1-55 are incorporated by reference.

57. Defendant also forced Mr. Brown to undergo a medical examination, interfered with Mr. Brown's ability to sell vehicles, and terminated Mr. Brown because of his age in violation of RSA 354-A.

58. Defendant's asserted reasons for its decision to force him to undergo a medical examination, its interference with his ability to sell vehicles, and its termination of his employment were pretexts for discrimination.

## COUNT V: NHWPA

59. Paragraphs 1-58 are incorporated by reference.

60. Defendant also retaliated against Mr. Brown because he, in good faith, reported what he reasonably believed were violations of laws or rules adopted under the laws of New Hampshire, a political subdivision of New Hampshire, and/or the United States.

61. Defendant forced Mr. Brown to undergo a medical examination, interfered with Mr. Brown's ability to sell vehicles, terminated Mr. Brown's employment, and interfered with his subsequent employment in retaliation for his reports of unlawful activity.

## COUNT VI: WRONGFUL TERMINATION

62. Paragraphs 1-61 are incorporated by reference.

63. Defendant wrongfully terminated Mr. Brown's employment in violation of public policy because he took actions that public policy would encourage, namely, for reporting concerns of unethical and illegal practices. *Cloutier v. Great Atlantic & Pac. Tea Co., Inc.,* 121 N.H. 915 (1981).

64. Defendant's wrongful termination of Mr. Brown was motivated by bad faith, retaliation, and malice. *Wenners v. Great State Beverages*, 140 N.H. 100, 103 (1995), *cert. denied*, 516 U.S. 1119 (1996).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of his rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E. Award equitable-relief for back pay, lost benefits, and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award enhanced compensatory damages in an amount to be determined at trial;

I. Award liquidated damages;

J. Award nominal damages;

K. Award attorney's fees, including legal expenses, and costs;

L. Award prejudgment interest;

M. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability, age, or whistleblower status;

N. Require Defendant's CEO to mail a letter to all employees notifying them of the verdict against it and stating that Defendant will not tolerate unlawful discrimination or retaliation in the future;

O. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

P. Require that Defendant train all management level employees on the protections afforded by the ADA, ADEA, 354-A, and the NHWPA;

Q. Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of disability discrimination, age discrimination, and/or whistleblower retaliation; and

R. Grant to Plaintiff such other and further relief as may be just and proper.

Respectfully submitted,

Dated: March 3, 2020   /s/ Allan K. Townsend

Allan K. Townsend
NH Bar No. 269356
Attorney for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
Allan@EmployeeRightsLaw.Attorney